## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

MICHAEL WAYNE FLINT,

        Plaintiff,

v.

UNIVERSITY OF CENTRAL FLORIDA,

        Defendant.

Case No. 6:20-CV-92-40-EJK

**COMPLAINT**

**Jury Trial Requested**

Plaintiff, Michael Wayne Flint, in pro se representation, states as follows:

### NATURE OF THE CASE

1.     This action seeks injunctive or declaratory relief, as well as monetary

damages, on behalf of the Plaintiff, Michael Wayne Flint.  This Plaintiff was

summarily dismissed from the Public Affairs Doctoral Program at the University

of Central Florida (hereinafter referred to as "UCF" or the "University"), on

January 21, 2017, just as he was finishing his dissertation and preparing to defend

this final phase of the long and arduous process required to earn this degree.  The

Plaintiff was both a full-time university instructor and a student in the doctoral

program, a challenging dual role which he undertook in 2006 in order to improve

his teaching abilities, to enhance his academic credentials, and to maintain a

current perspective on the evolving knowledge and issues related to his field.

1

2.  The Defendant University has made efforts to support and reward other university students and officials, even when they have been involved in financial misfeasance and violations of criminal laws. In sharp contrast, this Plaintiff did nothing wrong in the nearly fifteen (15) years that he had conscientiously worked and studied at the University of Central Florida at the time of his academic dismissal. In fact, this Plaintiff spent spotless decades in dedicated public service, as a decorated American soldier fighting on foreign battlefields, as a crime fighting police officer for Florida communities, and as a dedicated teacher in UCF classrooms. In fact, most of the delays that he encountered as he attempted to complete his doctoral program were the responsibility of the university and the various health issues that he and his family experienced. In spite of these considerations, and in stark comparison to the way that others were treated, even when their individual performance had raised ethical concerns, this Plaintiff's simple plea for a bit more time to finish and defend his dissertation was rejected, despite prior promises that he could continue in the program by retaking a few of his earliest courses. He was then subjected to the most severe form of academic penalties and immediately dismissed from the doctoral program.

3.  Within the university bureaucracy, union grievance challenges were quickly rejected. Academic appeal processes were summarily dismissed. Employment discrimination complaints were ruled to be unfounded. Written requests for assistance from three successive university presidents were simply ignored,

2

without even a courtesy response. Outside of the administrative infrastructure of the university, appeals for assistance and support were also exercises in futility. Formal requests for assistance from the Florida Department of Education and the Florida University Board of Governors were answered with the comment that there was nothing that the Board of Governors could do, suggesting that this Plaintiff talk to the UCF Ombuds Office. The Plaintiff did so, and that office also responded with a comment that there was nothing that they could do. Complaints filed with the Florida Commission on Human Relations (hereinafter referred to as "FHRC") were also unproductive. The Florida Department of Administrative Hearings, which limited its recommendation authority to employment discrimination matters, ruled that the issues were not sufficiently related to employment. Although the Administrative Hearing Judge rendered an opinion that the Plaintiff was treated very unfairly by the UCF Defendant, he ruled that his tribunal had no authority regarding those matters. The Plaintiff then notified the federal office for the Equal Employment Opportunity Commission, which adopted the findings of the FHRC and issued a "Right to Sue Letter" that has brought the Plaintiff before this United States District Court at this time.

4.      The Plaintiff's professional and personal lives were shredded by this fruitless litany of three (3) years of administrative impasses that followed on the heels of his humiliating and unjust dismissal from the Public Affairs Doctoral Program. Suggestions that this matter could be easily settled by giving him more

3

time to complete his dissertation went entirely unheeded by the Defendant University and its agents.  He was subjected to denigration and disdain by the University.   He had earlier experienced an exposure to a hazardous work environment at the University, and its nearly fatal aftermath, which the University characterized as a  relatively trivial matter that only contributed in a minor way to his lack of progress in his doctoral program.  The Defendant University's maltreatment in the midst of the Plaintiff's appeals led to his forced resignation from his employment, the dissolution of his marriage of some thirty-seven (37) years, his complete financial ruin, and the exacerbation of his serious  disability and health issues.

5.        The Defendant UCF's refusal to simply allow this Plaintiff to finish his nearly completed dissertation, after fifteen (15) years of unblemished service to that University, during which he taught many thousands of undergraduate students, while finishing all of his doctoral coursework, passing his arduous comprehensive exams, and successfully defending his dissertation prospectus, exemplifies discriminatory and disparate treatment to an actionable degree. Examples of the University leadership's scandalous ethical lapses during that time are well documented, while this Plaintiff's employment history is pristine, from a distinguished law enforcement career, all the way back to those battlefields where he fought for his country in 1969 and 1970.

6.        The racketeering behavior of the University leadership team created a

4

corrosive and abusive management atmosphere that adversely affected both students and employees.  Money that was intended for students and faculty was instead used to fuel a building boom that created a blizzard of construction contracts.  A joke around campus during those times was that "UCF meant Under Construction Forever."  Their misguided leadership conduct, and that of some of their subordinates and agents, constituted violations of state and federal laws that seek to protect University public funds, University employees, and University students from significant financial fraud and from unfair treatment in their workplace and in their studies, regardless of their status or infirmity.  The Plaintiff suffered substantial damages due to the Defendant University's adverse actions, and he deserves relief for all of that painfully tortious, outrageously discriminatory, and adversely disparate treatment, and for its aftermath, to whatever extent that this Court will authorize.

## RESERVATION TO NAME ADDITIONAL DEFENDANTS

7.      In addition to the entities set forth as Defendants herein, there are likely other parties who may well be liable to Plaintiff, but respecting whom Plaintiff currently lacks specific facts to permit Plaintiff to name such entities or persons as party Defendants at this time.  By not naming such persons or entities at this time, Plaintiff is not waiving his right to amend this pleading, and to add such parties, should the new facts warrant such amendments.

5

## JURISDICTION AND VENUE

8.        This Court has the jurisdictional authority to interpret and apply all of the

federal statutes and regulations cited below.  This Court has subject matter

jurisdiction to declare the rights and legal relations of the parties and to order

further relief pursuant to the federal question provisions of 28 U.S.C. §§ 1331 et

seq. and the civil rights provisions of 28 U.S.C.§§ 1343 et seq.  This Court also

acquires supplemental jurisdiction over state law claims that arose from the same

common focus of facts pursuant to the provisions of 28 U.S.C. § 1367.

9.        Plaintiff brings this cause of action before this Court and asserts that this

Court has jurisdiction to consider violations of the civil racketeering statutes

conforming to the appropriate provisions of 18 U.S.C. §§ 1961 et seq. and the

substantive provisions concerning wire fraud violations in 18 U.S.C. § 1956(h)

and 18 U.S.C. §§ 371, 641.  Plaintiff also refers to the state law violations

concerning organized scheme to defraud contained in Florida Statute 817.34 as

additional predication.

10.       This Plaintiff asserts that this Court has jurisdiction to consider this cause of

action pursuant to the applicable provisions regarding civil action for deprivation

of rights in 42 U.S.C. §§ 1983 et seq., and for violations of his civil rights as

guaranteed by the Fourth and Fourteenth Amendments to the United States

Constitution.  He further states that this Court has jurisdiction to examine his

rights as to the employment, training, and certification protections related to the

6

military service discrimination provisions of 38 U.S.C. 4301 et seq. (USERRA),

to include a waiver of filing fees regarding this cause of action.  This plaintiff also

asserts that this Court has jurisdiction to examine the relevant age discrimination

provisions of 29 U.S.C. §§ 621-634, and the authority to interpret and apply the

disability discrimination provisions of 42 U.S.C. §§ 12101 et seq. and 29 U.S.C.

§§ 791 et seq. as they are relevant to this case.

11.     Plaintiff further asserts that this Court has jurisdiction to apply the

provisions of the relevant occupational health and safety provisions of 29 U.S.C.

§§ 651 et seq., and the liabilities that a lax and irresponsible attitude on the part of

University management created for him, and for a treasured colleague who later

died from these hazardous exposures.

12.     This Court has jurisdiction to determine the rights and legal relationships

involving these parties and to order further relief pursuant to 28 U.S.C. §§ 2201

and 2202. The Court is authorized to issue injunctive relief pursuant to Fed. R.

Civ. P. 65, and to award relief under the provisions of 42 U.S.C. §§ 300(a) et seq.,

including but not limited to damages and attorneys fees.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and M.D.

Fla. Loc. R. 1.02 (c).  The main campus of the Defendant University is located in

Orange County, Florida, and nearly all of the harmful activities that so adversely

affected this Plaintiff occurred at that location.

7

## IDENTIFICATION OF PARTIES AND JURISDICTION

14.      The plaintiff, Michael Wayne Flint, is a natural person residing in Tallahassee, Florida.  He previously resided in Titusville, Florida, and he has worked for the University of Central Florida since July of 2002, primarily as a full-time faculty member and instructor.  Prior to his formal dismissal from the Public Affairs Doctoral Program in January of 2017, he had been studying in that credentialing program since August of 2006, with periodic delays and interruptions due to the frailties of his advanced age, his prolonged illness, his chronic disease sequelae, family tribulations related to health and parenting concerns, chronic wartime disabilities, and the extensive obstacles and delays imposed by the Defendant University.

15.      The Defendant, the University of Central Florida, is a publicly chartered space-grant university, with its main campus located in the northeast quadrant of Orange County, Florida, with an Orlando area postal code.  It is the largest institution of higher learning in the state, and one of the largest universities in the nation, serving a population of  nearly 70,000 students.

## FACTUAL CONTEXT

16.      These factual circumstances have a long history, but it is one that is very relevant to Plaintiff's complaints.  Amidst the turmoil and polarization that the Plaintiff, Michael Wayne Flint, observed as a student at Yale University in 1965 and 1966, he took a leave of absence from that school and enlisted in the Army in

1967, intending to find out what this Southeast Asian conflict was really all about. In 1968, he received a commission as an infantry officer and was assigned to military bases in West Germany. In 1969, he was transferred to the southern I-Corps region of South Vietnam, where he commanded a platoon and a company assigned to combat operations. He was twice blown up by enemy actions in 1970, and the second such incident peppered him with shrapnel wounds and traumatically injured his brain. He received two (2) Bronze Star awards and a Purple Heart. His life was forever changed by these experiences and injuries, but he returned to Yale University and tried to soldier on with studies in his favored field, which was astrophysics.

17.     His life began a difficult and torturous course, as he switched majors from a rigorous astronomy and physics curriculum to a major in psychology. Getting married for the first time, he eventually graduated in 1973 and later moved to attend the University of Miami School of Law. A first divorce followed, and alcohol abuse had become a problem, as had a lack of financial resources as his GI Bill benefits were exhausted. Consequently, he left law school in 1975 and found employment as a corrections officer at the county jail in Miami, sending money back to his home state of New Hampshire to help his ill and destitute parents. He became a local police officer in 1978, married for the second time, and a few years later obtained another divorce. As his police career blossomed, he married for a third time, a marriage which lasted for thirty-seven (37) years,

while he joined the Florida Department of Law Enforcement and served in the
Miami and Jacksonville Regions.  He served as the Assistant Special Agent in
Charge in Jacksonville and as the Chief of Investigative Services in Miami.  He
received many awards for his law enforcement service over the years.  He
eventually retired in 2002, earned his master's degree in criminal justice, and
became involved in police information sharing research at the University of
Central Florida in Orlando in the aftermath of the 911 attacks.  He accepted a
full-time faculty position at that institution in 2004 and served as an instructor in
the criminal justice field for some thirteen (13) years prior to the date of his
dismissal from the doctoral program.

In 2006, this Plaintiff entered the Public Affairs Doctoral Program that was
designed to accommodate students who also worked full time in various career
fields.  While he was toiling away as an instructor teaching hundreds of students,
and as a student himself taking challenging courses in the Public Affairs Doctoral
Program, Plaintiff's wife at that time was diagnosed with breast cancer in 2008.
She ultimately underwent surgery to remove that tumor, followed up with
chemotherapy and radiation treatments.  This Plaintiff asked the Director of the
Public Affairs Doctoral Program if he could suspend his participation in the
classwork to spend time attending to the treatment needs of his then-wife.  That
request was granted, and this Plaintiff continued his full-time teaching
assignment, while helping his then-wife with her medical appointments and her

ultimately successful treatments.

18.       The year 2009 saw the Plaintiff returning to his full role as an Instructor and a doctoral student.  In December of that year he suddenly contracted a devastating illness, eventually diagnosed as the Miller-Fisher variant of the Guillain-Barré Syndrome.  This was a neurological disease which can have serious and even fatal health consequences.  The Plaintiff nearly suffered that fate while on life support in an intensive care unit, but he survived.  After a period of recuperation and recovery, he returned to work in August of 2010.  That return included continuing participation in the Public Affairs Doctoral Program, as well as full-time teaching responsibilities.  This return to work and study was probably premature, since this disorder was known to have many recovery pitfalls and adverse health sequelae.  The Plaintiff had been without any salary income for some months, however, so a speedy return to work was an economic necessity. During the period when this Plaintiff was unconscious and on life support, the economic recession affected his real estate holdings in financially disastrous ways.  With no income and no cognitive competency to weather that financial storm, the properties were liquidated and the plaintiff lost most of his net worth.

19.       Once he returned to work in the fall semester of 2010, this Plaintiff  soon learned that another teacher in his college had contracted a similar health condition around the same time, another case where the odds of contracting that disease were a million to one probability.  This Plaintiff did not know this adjunct

instructor in the Department of Criminal Justice and Legal Studies, but they both taught classes in the same building and may have taught in some of the same classrooms. This Plaintiff made telephone contact with this colleague, who was an Assistant United States Attorney in the Orlando Office of the United States Department of Justice. He reported that his condition was very similar to the illness that the plaintiff had suffered from. Initially, he had recovered and returned to work, but further telephone contacts indicated that he was feeling sickly once again, a sign of the relapse phenomenon known to affect patients with this disorder. On a final phone call, he reported that he was no longer working and would be going to a hospital affiliated with the University of Florida for further treatment. This Plaintiff later learned that he had passed away while undergoing additional therapies.

20.     Noting that two patients with very rare and similar conditions had contracted this disorder around the same time under similar workplace conditions in the same location, and that one of them had died from this disease, the Plaintiff made telephone contact with the medical staff at the University campus health center. The nursing director who spoke with him assured him that she would discuss the matter with the medical director. When he did not hear from her after the passage of some time, the Plaintiff called her back. She informed him that the medical director had expressed no interest in discussing the matter any further. The Plaintiff wondered how the fact that two instructors at the university had

contracted this very rare disease was not a matter of interest for those charged with protecting the health of students and employees at the university.  This seemed especially confounding considering that there were one in a million odds that an individual would contract this illness, and two faculty members had developed the condition in the same time frame, while working in the same building, and possibly the same classrooms.  The potential urgency concerning this situation seemed obvious, especially when one died and the other one, this Plaintiff, nearly succumbed.  Nonetheless, the response seemed to demonstrate a total lack of interest on the part of the Defendant University healthcare system on the Main Campus of the University of Central Florida.

21.     Later on, when this Plaintiff was appealing his dismissal from the Public Affairs Doctoral Program, the fact that he had suffered a prolonged battle with a deadly illness in the midst of his program participation seemed of little concern to the University administrators.  They were dismissive of these health tribulations and their aftereffects, and to a large extent they minimized their significance and even used their impact on the Plaintiff's productivity against him.

22.     Once he had completed all required coursework in the doctoral program, this Plaintiff sat for twenty-four (24) hours of comprehensive exams, repeating one eight (8) hour segment after failing it the first time.  He accomplished these milestones while continuing to teach as a full-time faculty member and while struggling with his disabilities and continuing health issues.

23.      After achieving a status where the only final step in the program was to create and defend his dissertation, the Plaintiff formed a dissertation committee, with a distinguished professor and a former department head as the chair of this committee. He began the writing process under the direction of this committee chair. He selected a topic and began creating hundreds of pages of written materials. Under the guidance of his committee chair, he did a lot of rewriting and revamping, probably totaling around five hundred (500) pages.

24.      During this period in 2012 and 2013, this plaintiff became a court-appointed guardian for a five-year old girl who was essentially orphaned by parental drug addiction and criminality. A distant cousin of Plaintiff's then-wife, the little girl was removed from this dysfunctional home populated by drug addicts and turned over to the plaintiff and his then-wife. Custody court battles followed, and the parents were eventually arrested. The family court granted permanent guardianship to this plaintiff and his then-wife. Today, some eight (8) years later, the devastating divorce in July of 2019 has resulted in this Plaintiff assuming the full responsibility for raising this child, due to health issues afflicting his former wife.

25.      While all of these issues were ongoing, the Plaintiff received notification that his dissertation chair planned to retire. In 2014, that retirement occurred, and the Plaintiff was forced to form a new dissertation committee that required him to change his dissertation topic entirely. He received support for that effort from a

14

new dissertation chair, a woman with impeccable credentials in the School of Social Work. A new topic was chosen that bridged the areas of the criminal justice and social work fields, and this Plaintiff started all over again. At a considerable cost, he rented an apartment right next to the university campus, far from his Titusville residence, where he could concentrate on writing a new dissertation. This new project had begun to take shape by 2015. He successfully defended his prospectus for that dissertation effort in January of 2016. He was advised by his new dissertation committee and the interim director of the doctoral program to finish this project and be ready to defend his dissertation in the summer of that year.

26.       It turned out that this Plaintiff's dissertation chair was not offered a summer position that would have authorized her to work on university business during that summer, so progress on the final dissertation draft was stalled temporarily. The Plaintiff did receive a summer contract to teach a couple of courses. When the regular school year reconvened in the fall of 2016, this Plaintiff's department chair, his boss in the employment sphere, told him that he would have to take a course to certify him to teach online. This was in addition to the four (4) large courses that he regularly taught in the fall semester. As that certification course progressed, the instructor advised the plaintiff that he would be flunking that course if he did not catch up with the coursework. In a full court press to catch up and finish that course, this Plaintiff finally finished all the work

15

and achieved that online teaching certification.  At that point, the fall semester was ending.  In the context of this extra work and the summer session hiatus which preceded it, progress on the final dissertation draft faltered.

27.     The Plaintiff believed that the interim director of the Public Affairs Doctoral Program would surely understand these difficulties and approve a bit more time for him to complete this dissertation process.  He had also received assurances from his dissertation chair that failure to meet the productivity timelines might require him to retake some of his earlier doctoral courses to be able to extend the deadlines.  This was not a problem at all, since Plaintiff enjoyed taking classes, and he had audited doctoral courses in the past, courses that he had already taken and passed, in order to achieve even better levels of understanding. Plaintiff was soon to learn that he had relied upon what he believed to be legitimate assurances from his dissertation chair, and that he had done so to his extreme detriment.

28.     Once the semester grading was completed in mid-December of 2016, he scheduled a meeting with the interim program director to discuss these issues.  To this Plaintiff's surprise, she advised him that he was being dismissed from the Public Affairs Doctoral Program.  When asked if he could receive some more time in the program in view of his disabilities and health issues, his employment work overload, and his enthusiastic willingness to repeat some earlier coursework, after previously receiving assurances that he could do that, the interim director

firmly refused to allow this.  The meeting was rather short and fairly abrupt.  The Plaintiff advised her that he would be suing the University of Central Florida if these issues could not be worked out, and the meeting ended.  In January of 2017, this Plaintiff received a letter from the College of Graduate Studies, dismissing him from the program.

29.     Three years of administrative appeals and complaints followed.  These included every conceivable entity that the Plaintiff could identify inside the university management infrastructure, and every state agency that might have some oversight responsibility over public university practices.  These efforts culminated in May of 2019, when the Florida Department of Administrative Hearings reviewed the facts and the arguments from both this petitioner and the respondent University.  The hearing judge felt constrained in his ability to adjudicate any issues under the Florida Statutes and Regulations, other than employment discrimination.  On that technicality, he ruled that there was none.  Nevertheless, his opinion stated that this Plaintiff had been treated very unfairly.

30.     This Plaintiff sought a "Right to Sue" letter from the United States Office of Equal Employment Opportunity.  The request was granted and the letter was issued in October of 2019.

## FACTUAL ALLEGATIONS

31.     During approximately three (3) years of fruitless administrative appeals and instances where Plaintiff's pleas were simply ignored or treated dismissively,

some of the true reasons for this disparate and unconscionable treatment of the Plaintiff became clearer, to wit:

32.     Racketeering activity and fiduciary malpractice which created a corrosive and abusive management enterprise, where managers at the University of Central Florida were encouraged to treat their disfavored subordinates with harsh reprisals and damaging measures, particularly when those students and faculty members were older, were disabled, or were veterans;

33.     Racketeering activity and financial misappropriations which adversely affected student and faculty resources at the University of Central Florida, which were supposed to be used to enhance educational capabilities for students and increase faculty salaries and benefits;

34.     Discrimination and disparate treatment regarding employment prospects, where opportunities for career advancement, educational credentialing, and protection from layoffs were curtailed by the University of Central Florida, particularly for those employees who were not part of favored groups because of age, disability, or veterans status;

35.     Discrimination and disparate treatment regarding educational opportunities, where academic administrators were allowed to badger targeted students and faculty at the University of Central Florida, when their productivity was limited by age, disability, or veterans status;

36.     Discrimination and disparate treatment by the University of Central Florida,

18

concerning employment prospects and educational opportunities where the disabilities originated as they did in the case of this Plaintiff, to wit:

37.          a.  Chronic injuries that the Plaintiff incurred in the midst of military combat operations during the Vietnam conflict; and

38.          b.  Continuing infirmities resulting from the Plaintiff's exposure to a hazardous work environment that contributed to the development of a serious and debilitating disease syndrome;

39.      Discrimination and disparate treatment regarding doctoral program delays and obstacles that were imposed by the defendant University of Central Florida and used against the Plaintiff to distort his productivity time line;

40.      Discrimination and disparate treatment concerning assurances made to Plaintiff that he could extend his time in the Public Affairs Doctoral Program by simply retaking a few earlier courses, whereas the academic administrators who dismissed him from the program abruptly withdrew those promises and abruptly pulled the rug out from under the Plaintiff's participation in the program, just as he was about to finish his dissertation;

41.      Equity claims and pleas for fundamental fairness requesting relief through a process of injunctive order or declaratory judgment leveled at the University of Central Florida.

**FIRST CLAIM FOR RELIEF**
**Racketeering**
Violation of 18 U.S.C. § 1961 et seq.

**Wire Fraud and Conspiracy to Commit Wire Fraud**
Violation of 18 U.S.C. § 1956(h) and 18 U.S.C. §§ 371, 641
**Organized Scheme to Defraud**
Violation of Florida Statute 817.34

42.     Paragraphs 1 through 41 are incorporated herein by reference.

43.     The University Defendant and some of its management staff at the highest

levels of the institutional administration constituted an enterprise that violated the

provisions of the federal racketeering statute, 18 U.S.C. §§ 1961 et seq.  This

occurred when a pattern of racketeering activity developed involving the

commission of two or more predicate crimes consisting of wire fraud and

conspiracy to commit wire fraud, and violations of the Florida Statute prohibiting

organized schemes to defraud, through a scheme or artifice to defraud students

and faculty members who were supposed to be the beneficiaries of the

misappropriated taxpayer and tuition funds, which were intended to be used to

enhance educational programs.  Over a period of years, this illicit management

enterprise created a climate of fear and intimidation that directly affected this

Plaintiff and other faculty members, who were eventually subjected to actionable

humiliations and adverse administrative treatment.

44.     The Plaintiff has suffered and continues to suffer injury and irreparable

harm by these actions of the Defendant University, thereby giving rise to the need

for injunctive and declaratory relief, an award of compensatory damages, and

other forms of relief from this Defendant, to include punitive damages.

## SECOND CLAIM FOR RELIEF
### Deprivation of Civil Rights
Violation of 42 U.S.C. §§ 1983 et seq.
Violation of the Fourth and Fourteenth Amendments to the U.S. Constitution
### Employment Discrimination and Disparate Treatment
Violation of  38 U.S.C. §§ 4301 et seq. (USERRA) and
### Age Discrimination and Disparate Treatment
Violation of 29 U.S.C. §§ 621-634
### Disability Discrimination and Disparate Treatment
Violation of 42 U.S.C. §§ 12101 et seq. and 29 U.S.C. §§ 791 et seq.

45.    This Plaintiff suffered the deprivation of his civil rights under color of law when the Defendant University unjustly and unfairly dismissed him from the Public Affairs Doctoral Program, just as he was finishing his dissertation.

46.    The Plaintiff experienced employment discrimination and disparate treatment when the Defendant University dismissed him from the Public Affairs Doctoral Program just as he was finishing his dissertation, thereby eliminating his opportunity for professional credentialing, protection from layoffs, and career advancement.

47.    This Plaintiff endured age discrimination and disparate treatment when the University Defendant dismissed him from the doctoral program, just as he was finishing his dissertation.

48.    The Plaintiff was deeply troubled when he experienced the cavalier attitude that the Defendant University displayed when he tried to discuss his nearly fatal illness contracted in their workplace.  He was equally dismayed to see their indifferent responses when he tried to explain the chronic injuries that he had suffered in military combat in Vietnam.  He thus endured discrimination and

21

disparate treatment for his resulting disabilities and was summarily dismissed

from the doctoral program, instead of being congratulated for his tenacious efforts

in the face of these chronic infirmities.

### THIRD CLAIM FOR RELIEF
**Personal Injury from Exposure to a Hazardous Work Environment**
Violation of 29 U.S.C. §§ 651 et seq.

49.     This Plaintiff was exposed to hazardous working conditions in the same

University academic facilities as a faculty colleague, and both Plaintiff and his

fellow instructor contracted a dangerous and sometimes fatal disease.  The

Plaintiff nearly died of this condition, and his colleague did pass away from this

disease.

50.     The Plaintiff also suffered further damages when the Defendant University

discounted the significance of his injuries and their aftereffects and used these

conditions, and the debilitating incapacitation and sequelae which they caused,

against him when calculating his dissertation productivity timeline.

51.     The Plaintiff has suffered and continues to suffer injury and irreparable

harm by these actions of the Defendant University, thereby giving rise to the need

for injunctive and declaratory relief, an award of compensatory damages, and

other forms of relief from this Defendant, to include punitive damages.

### FOURTH CLAIM FOR RELIEF
**Equity Issues**
**Different Treatments for Different Classes of People**
**Breach of Contract and Promissory Assurances**
**Refusal to Accept Responsibility for Delays Caused by the Defendant**
**Deceptive Manipulation of the Productivity Timeline**

22

52.     When all of the expressly statutory and regulatory issues have been considered, there remain the common law standards of behavior that embrace fundamental fairness and just treatment in the course of human affairs.  This Plaintiff was treated very unfairly, and the totality of the circumstances surrounding the way that he was treated by the Defendant University and its agents and leadership staff constitute a clear and apparent affront to those standards.  This is not what citizens expect from university administrators, and this ill treatment of a dedicated public servant with many decades of unblemished service stands in stark contrast to the way that top administrative officials at the Defendant University were treated when they were unexpectedly discovered to be involved in financial wrongdoing and misfeasance.  Other instances of this inverted values paradigm exist as well at this institution, where good behavior is sometimes punished and bad behavior is often rewarded.

53.     The Plaintiff was assured that he could extend his participation in the Public Affairs Doctoral Program by retaking a few of his earliest courses.  While that seemed a little unfair under the circumstances, he was happy to do it if that helped to resolve any potential disputes.  This Plaintiff relied on those encouraging assurances from his dissertation chair, but they were ignored and denied by the interim program director and the College of Graduate Studies when he was quickly dismissed from the program despite these prior promises.

54.     If all the other insults and injuries are discounted, for no other reasons than

23

these principles of equity, the Plaintiff has suffered and continues to suffer serious damages and harm by these actions of the Defendant University, thereby giving rise to the need for injunctive and declaratory relief, an award of compensatory damages, and other forms of relief from this Defendant, to include punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, this Plaintiff respectfully requests that this Court enter judgment against Defendants and provide Plaintiff with the following relief:

A.    That this Court enter a judgment declaring that the University Defendant violated the provisions of the statutory, regulatory, and common law principles enumerated above.

B.    That this Court issue an injunction that orders the Defendant to reinstate the Plaintiff in its Public Affairs Doctoral Program and allow him to continue his studies, realizing that the three (3) year suspension period that the Defendants have imposed upon the Plaintiff at the date of this filing will make continuing with that dissertation very difficult, probably necessitating making the collection of new data a necessity, or even starting that dissertation process all over again.

C.    Compensatory damages to the Plaintiff in the amount of two million two hundred thousand dollars ($2,200,000).

D.    Where applicable, an award of punitive damages.

E.    An award of reasonable attorneys' fees and costs incurred in this action.

F.    Any other and further relief as this Court would deem necessary and proper.

This plaintiff requests a jury trial for all claims so triable.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I filed today, on Thursday, January 17, 2020,

the foregoing with the Federal Clerk of the Court for the Middle District of Florida,

which will send notification of this filing to all such persons registered for this case,

including the Defendant's counsel.

Respectfully submitted, this 16th day of June, 2020,

By Pro Se Representative for the Plaintiff :

Pro Se Representative
Michael Wayne Flint
16068 Sunray Road
Tallahassee, Florida 32309
Email: mflint47@gmail.com
Phone: 321-289-2819

25

O'CONNOR & O'CONNOR, LLC
800 North Magnolia Avenue, Ste 1350
Orlando, FL 32803
Attn:  DEREK J. ANGELL, ESQUIRE, or
Designee

Office of the General Counsel
University of Central Florida
Millican Hall, Suite 360
4365 Andromeda Loop North
Orlando, FL 32816-0015

EEOC Form 161 (11/16)     **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

| | |
|---|---|
| To:   **Mr. Michael W. Flint**<br><br>**1317 Indian River Avenue**<br>**Titusville, FL 32780** | From:   **Miami District Office**<br>**Miami Tower, 100 S E 2nd Street**<br>**Suite 1500**<br>**Miami, FL 33131** |

| | | |
|---|---|---|
| ☐ | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) | |
| EEOC Charge No. | EEOC Representative | Telephone No. |
| **15D-2018-00418** | **Ina Depaz,**<br>**State & Local Coordinator** | **(305) 808-1752** |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐   The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐   Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐   The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐   Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☐   The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

☐   The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐   Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Nitza Sonta Wright*                              OCT 17 2019

Enclosures(s)

**Michael J. Farrell,**
**District Director**                                           (Date Mailed)

cc:

**University of Central Florida, Department of Criminal**
**Justice, College of Health And Public Affairs**
**c/o Ms. Maria Beckman**
**4365 Andromeda Loop N, Suite 360**
**Orlando, FL 32816**

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA):**   The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**"Actual" disability or a "record of" a disability (note: if you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability):**

- ➤ **The limitations from the impairment no longer have to be severe or significant** for the impairment to be considered substantially limiting.
- ➤ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities"** now include **the operation of major bodily functions,** such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.
- ➤ **Only one** major life activity need be substantially limited.
- ➤ With the exception of ordinary eyeglasses or contact lenses, **the beneficial effects of "mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.
- ➤ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active.**
- ➤ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months.**

**"Regarded as" coverage:**

- ➤ An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).
- ➤ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.
- ➤ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively *BOTH* transitory (lasting or expected to last six months or less) *AND* minor.
- ➤ A person is not able to bring a failure to accommodate claim *if* the individual is covered only under the "regarded as" definition of "disability."

*Note:   Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment.  Beyond the initial pleading stage, some courts will require specific evidence to establish disability.*  For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.